CHARLES W. TROTTER, appellant.

CHARLES A. HECKSCHER and THE LEHIGH ZINC AND IRON COMPANY, LIMITED, respondents.

1. By a contract under seal, complainant covenanted to mine and deliver to defendants, on board cars at Franklin, 1,000 tons of franklinite ore per month for a year, guaranteeing that the ore should contain at least 26 per cent. of oxide of zinc, and agreed that on his failure to do so for thirty days defendants might take possession of the mine after giving him thirty days' notice of their intention. Defendants agreed to analyze the ore and pay for each month's delivery on the 15th day of the succeeding month, at a desig-

Trotter *v.* Heckscher.

mated scale of prices for all ore delivered containing 26 per cent. or more of Zn. O., and at prices to be thereafter agreed on for all inferior ore accepted by them.—*Held,* that defendants were not bound to test the ore before receiving it on the cars at Franklin, but might test it after it was unloaded at their works in Bethlehem, and that, by accepting ore, they were not estopped from showing that it contained less than 26 per cent. of Zn. O.

2. Under the contract above stated, defendants made full payment, at the stipulated prices, for all ores delivered which were up to the standard quality according to their analyses, and at prices which they thought fair for all accepted ore of inferior grade according to their analyses (no other prices having been agreed on). Complainant demanded payment for all ore as being above the standard, and because of non-payment stopped delivery, and thereupon defendants gave the thirty days' notice that they would take possession of the mine. On bill filed, the court found that some ore delivered was richer than defendants' analyses showed, and for ore below the standard, fixed prices higher than those paid by defendants but lower than those demanded by complainant, and decided that when complainant stopped delivery defendants were in arrears with payments.—*Held,* that defendants' conduct did not evince an intention to abandon the contract or a design not to be bound by its terms, and that complainant's stoppage of deliveries was without justification, and that on the expiration of the notice defendants became entitled to possession of the mine. *Blackburn* v. *Reilly, 13 Vr. 290,* re-affirmed.

3. Under the contract above stated—*Held,* that defendants were not entitled, on their cross-bill filed against complainant's bill, for an account of ore delivered, to have their damages arising from the breach of complainant's covenant to deliver, assessed in equity and set off against the sum due complainant for ore delivered.

4. The fact that cross-demands, otherwise distinct, spring out of the same contract, does not create an equitable right to set off one against the other.

----

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions:

The issue in this case will appear by a presentation of the pleadings. The bill shows that in the year 1877 the complainant became possessed of an estate for the term of thirty years in a mine of franklinite ore in Sussex county, and that on June 2d, 1881, he made an agreement with one Charles A. Heckscher, of Philadelphia, a full synopsis of which will appear hereafter.

The bill alleges that Heckscher was the treasurer of a corporation of the state of Pennsylvania by the name of " The Lehigh Zinc and Iron Company, Limited," having its works and place

of business at Bethlehem, and that said agreement was made for said corporation and that it was immediately assigned to it.

The bill alleges that the subject-matter of said agreement was a certain ore called franklinite, in contradistinction to what is known as zinc ore; that the latter contains for the most part the red oxide of zinc, while the said franklinite is generally known as an iron ore but contains and is composed of a very considerable proportion of the silicate of zinc in combination with manganese, and from which, by certain treatment thereof, there is derived an amount of zinc giving it increased value, and that Heckscher desired such ore for the production of both zinc and iron.

The bill charges that it was contemplated by the parties that said ore, as soon as it should be raised from the mine and before it was delivered to said Heckscher on board the cars at Franklin, should be subjected to an assay, to be made by the said Heckscher, to determine the percentage of the oxide of zinc therein, and that, by the express terms of said instrument, Heckscher was not to take any ore unless it contained at least 26 per cent. of said oxide, and that if he did he was not bound to pay the contract price, but such price as should be agreed upon; that the point of delivery of said ore was the railroad cars at Franklin; that as soon as the ore was delivered on said cars the property therein changed and it became the property of said Heckscher or of his assigns; that they then and there took the same, and that, as a consequence of these premises, it resulted that no assay made thereafter of said ore by said Heckscher or his assigns was such an assay as was contemplated by said agreement; that the acceptance thereof on board of said cars was a taking thereof by the vendee as being the ore bargained for, and entitled the complainant to receive therefor the contract price of at least $3.75 for each ton.

The bill charges that it was the duty of Heckscher to have a person skilled in assaying ores always at said mine, who should assay the ores prior to the delivery thereof on board the cars, and whose assay, when made, should be immediately reported to the complainant, who, in case such assay was not satisfactory,

should appoint another assayer to test the quality of said ore as to the percentage of oxide of zinc, and in case the said two assayers should disagree, that then the parties should jointly appoint a third assayer, or if they disagreed as to the person, the said two assayers should make such appointment, and that his decision should be final, and further charges that in no other way could said agreement be carried out; that some disinterested person should select, from a specified quantity of ore ready for delivery, a small amount which should be a fair and just sample of the mass, the oxide of zinc in which sample would represent the oxide of zinc in the mass, and that such selection and assaying should occur upon the ground where both parties had sight and knowledge, and if it was after delivery it would be impossible for the complainant ever to have the means of determining whether or not it was or ought to be held to be a satisfactory assay, and shows that because this construction of the contract was not adopted, and the attempt made, injudiciously at first and afterwards obstinately by the defendants, to execute it otherwise, the said parties have fallen into difficulty requiring the intervention of this court.

The bill then states that when said agreement was made, it was necessary that said complainant should have funds to prepare said mines, and that it was orally agreed prior thereto that an advance of $10,000 should be made; that Heckscher did not desire to receive the 1,000 tons in June, his works not then being ready for so much, and expressly requested that none should be sent until the 16th day of June, upon which day he telegraphed for same; that the execution of said contract was not begun by said complainant until the 20th day of June, when the work commenced, it being understood that the ores sent in June should be part of the July shipment, and that from that time the complainant mined and delivered ores as rapidly and as completely as possible.

The bill states that because of the illness of complainant, and other causes not within his control, he has been unable to deliver ore to the amount stipulated by said agreement, though he has

delivered nearly 8,000 tons, and would have delivered much more had it not been for the disagreements detailed. The bill states that on June 8th, Heckscher made an advance, not of $10,000, as agreed, but of $6,000, and that the fact that such an advance had been made to him, and the confidence which in the beginning he felt in the good intent and the business reliability of the parties, as well as his belief that there could be no real difficulty nor any substantial difference in regard to the assay, and kindred considerations, induced complainant not to insist upon the assay of said ore prior to delivery, especially as he regarded them bound to pay for said ore at the contract price, if, without such previous assay, they took it, and even acquiesced, though not in such a way as to bind him, in said defendants, making their assay after receiving the ore delivered to them; and that he was assured no difficulties would occur in said assay, and that all matters should be satisfactorily adjusted, and that he did not apprehend how much difference there might be in the results through different and especially unfair sampling; that defendants rendered a report of their assay, first for part of the ore delivered in June at rates from 11.30 to 12.25 of zinc; to which complainant immediately objected, and which was acknowledged at once as erroneous; that defendants sent a sample of the ore to complainant, which he found by assay to contain 22 per cent. of zinc; that in August they sent new assays of this June and July ore, making it to contain 22 per cent.; then they employed a distinguished expert, who assayed the ore delivered in August and September, whose assays were almost the same as that made by complainant, and showed that the ore delivered contained much more than 26 per cent. of zinc; that the defendant rendered a report of the assay of the October ore at 23.88; for the November ore at 24.87, and for the December ore at 21.40, none of which the complainant believes was made by competent parties; and that no report, except a statement afterwards named, has since been made; and then states that complainant caused careful sampling and assaying of said ore to be made prior to its being sent; and that the assay delivered in July was 27 per cent., in August 28.70, in September 34.50 per cent.; and

Trotter *v.* Heckscher.

that after this the complainant made assays prior to delivering the ore, and sent his bills therefor; and that according to these assays and bills, rendered monthly, or as soon as complainant's health would permit, he had furnished 7,573.01 tons prior to May 1st, 1882, making, without interest, due to him, $50,369.94, and with interest $51,257.99, leaving a balance due him May 15th, 1882, of $31,663.32.

The bill then states that defendants refused to pay him, and because of such refusal he became embarrassed, and becoming convinced that the defendants did not intend to pay him nor to deal fairly with him, he stopped all shipments of ore, and on May 1st, 1882, notified defendants that he should not go on; that on May 11th, 1882, the defendants gave written notice that they would take possession of said mine and machinery, and take ore for their own use according to said agreement; and denies their right to take possession, because he says the event contemplated by the agreement has not arisen—that is, the inability of complainant to deliver, since during the last preceding month he delivered over 1,000 tons; and insists that he was justified in not delivering more and in not surrendering possession, since they neglected to pay the amounts due for February, March and April.

The bill then shows that the defendants submitted a statement, showing a balance due to them in excess of the amount the complainant claimed, of $4,960.07, based upon assays and prices altogether variant from the true assays and prices then exhibiting the value of the ores as presented by defendants, and as claimed by him, thus:

|  |  | Per cent. | Per cent. |  |
|---|---|---|---|---|
| June and July, 1881, |  | 22, | when really 27 |  |
| August, | " | 26.28, | " | 28.70 |
| September, | " | 33.60, | " | 34.50 |
| October, | " | 23.88, | " | 29 |
| November, | " | 24.87, | " | 29.48 |
| December, | " | 21.40, | " | 30.03 |
| January, | 1882, | 16.70, | " | 20 |
| February, | " | 24.70, | " | 35.48 |
| March, | " | 21.90, | " | 38.12 |
| April, | " | 18.60, | " | 40.16 |

Crediting the complainant with such prices as to make them owe only $1.67½ per ton for all the ore by them received, excepting that delivered in August (548.02 tons), at $3.89, and 262.13 tons at $7.55, which they seek to justify by saying that $1.67½ was the market price of mangan iron ore, while nearly 3,375 tons contained on an average on their own showing 24.12 per cent., and had a much greater value than iron ore, while of the remainder, about 4,100, one-half ranged at nearly 22 per cent., according to their erroneous report, and the other half from 17 to 19.

It is then stated that defendants gave notice on May 22d, 1882, that at the expiration of the time for the delivery of the 12,000 tons they would assert and exercise the right which they claim to take, and would take regular monthly quantities of ore from said mine, according to said agreement, until March 6th, 1907, the complainant insisting that it is thus apparent that the defendants intend to take possession of the mine, and to keep it until 1907, taking ore as they please, paying therefor according to assays corresponding to those already presented; and charges that the defendants designed to render it impossible for the complainant to comply with his contract, and furnish the 1,000 tons per month by withholding his pay, thereby producing what followed—the cessation of the delivery of the ore—and that they intend, if they get possession, to retain it, take what ore they please, upon assays however erroneous, making the expense of mining what they please; and charges that all difference has arisen from the failure of the defendants to abide by the contract, and that it is for this court to give relief, and to enforce the contract, and, if need be, to reform it so as to make it conform to the intention of the parties; again, insisting that the place of delivery was Franklin; that it was the duty of defendants to cause an assay to be made before accepting the same, to ascertain whether or not it contained 26 per cent. of zinc, since if it did not they were not bound to take it; so that if such assay should be erroneous the com-

plainant might appoint an assayer, and then, in case of disagreement, a third one could be appointed.

All these material points are covered by appropriate prayers, with prayers for an account and for an injunction.

I have thus given a full and fair synopsis of the bill, because the very able arguments of counsel on final hearing are most skillfully interwoven with the facts in the bill showing to the practiced eye both the strength and weakness of the complainant's case.

The answer declares that defendants purchased large and valuable works, engaged labor and entered into extensive contracts solely on the basis of said agreement, absolutely needing the amount of ore of the quality agreed upon at the times specified, admitting what is said in the bill respecting the combinations which form this ore.

The answer denies that by said agreement the ore should be assayed at the mine before delivery; denies that by the terms of the agreement, or otherwise, the defendants were to take any ore unless the same contained 26 per cent. of said oxide, and admits that they were not compelled to take or pay for any ore containing less than said percentage of oxide; avers that by section 9 of the agreement it was provided that if said mine should be incapable of producing the quantity of ore required of the value of 26 per cent. by assay, but should be capable of producing an inferior quality of ore, below 26 per cent., the said defendants should have the privilege of taking any quantity of said inferior ore at such rate as might be agreed upon between the parties, not to exceed $3.75 per ton, or the market value of iron ore as mangan iron ore.

The answer denies that upon the delivery of the ore on the cars at Franklin the property therein was so transferred that the defendants took the same without any right thereafter of making an assay thereof; denies that such acceptance on board the cars was such taking of the same as being the one bargained for as entitled the complainant to receive at least $3.75 without assay or the finding out of the percentage of said oxide, insisting that such construction would be unjust to both, binding defendants to

pay too high for ores containing less than 26 per cent. and pre-
venting the complainant from receiving the additional fifty cents
for every 1 per cent. above 26, and avers that the statement in
reference to the delivery of the ore on the cars at Franklin merely
settled the point at which the relative expense of delivery and
transportation was to be adjusted, and nothing more, and also
avers that complainant must have so understood the agreement,
for he never weighed any ore at the mine but took the weight
from the railroad company, who weighed it at Hackettstown,
thirty miles away, where it was weighed under the directions of
complainant; and says that on the 24th of June, 1881, on receipt
of the first ore from complainant, one John Price Wetherill, on
behalf of defendants, wrote to complainant advising him of the
proposed mode and place of sampling and assaying at the com-
pany's works, as follows:

"I have received to date nine cars of ore and one car of limestone that you
have shipped. I will run through the Blake crusher one cart-load from each
car, and will run through the fine crusher one wheelbarrow of each cart-load
run through the Blake; from this I will take a number of handfuls over the
pile, and from these, when thoroughly mixed together, take samples for an-
alysis. This I suggest as a fair method of arriving at the value of the ore.
Shall be pleased to have any suggestions you may have to offer on the subject.
I will have analysis made now of the nine cars shipped, in order that you
may know how it runs and as a guide for further shipments."

To which complainant replied the next day, thus:

"Yours of 24th instant received. Your method of sampling for assay is as
good as can be devised, and fair to both; I would only suggest that you wait
until you receive this week's shipments, about two hundred tons, and then
take your samples."

Thus, at the outset, agreeing upon the place and method of
sampling, which has been strictly pursued by the defendants
until April, 1882, without any objection by the complainant
until the filing of his bill.

The answer says that William Dixson had charge of the oxide

works of defendant, and that he was appointed thereto at the solicitation and recommendation of complainant as a competent and upright man for the position, and that he sampled all the ores, and that there were no conveniences or opportunity at the mine to sample and crush said ores as is by the bill, for the first time, suggested, and denies that the contract requires that defendants should always have a person skilled in assaying ores at the mine, who should assay the ores before delivery, and whose assay should immediately be reported to complainant.

The answer further says that the method of sampling above named, which was adopted by them and approved by the complainant, is the most perfect that can be adopted short of crushing the whole mass; and denies that the method stated by the complainant can give just results; and avers that no one can select from a specified quantity of ore ready for delivery, containing all grades of quality down to absolutely worthless ore, any amount or specimen which could be a fair and just sample of the mass or ton, and show therefrom the proper percentage of the mass, insisting it could only show the percentage of the sample, but not of the mass, unless such mass were homogeneous and of equally distributed value; and that the methods claimed by complainant, that sampling should be done at the mine, were first stated in this bill; and that defendants repeatedly invited complainant to visit or to send anyone to visit their works, and to inspect the process of sampling and assaying, offering the fullest opportunity of examining the same, as well as their books, and inviting suggestions as to any improvements.

The defendants deny that there ever was any understanding, before or after the contract was executed, that Heckscher would advance $10,000 to enable complainant to carry out the contract, but aver that after the execution of the contract the complainant said that he was without money to carry it out, and would take it as a great favor if Heckscher would advance him money to work the mine; that Heckscher asked how much it would require, and complainant said about $6,000, whereupon Heckscher gave him a draft for that amount.

The defendants deny that the causes of non-delivery of the stipulated quantities and quality were beyond the complainant's control; admit that at the time of filing said bill he had delivered less than 8,000 tons, and aver that he had delivered only 7,576.14 of every kind, including limestone; deny that in any case there was any unfair sampling or assaying; say that the first 114 tons were sampled according to agreement by letters of June 24th and 25th, 1881, portions of which samples were submitted to Professor Mahan, of the Lehigh University, and also to Professor Charles P. Williams, mining chemist, of Philadelphia, and that the former returned as the rate of oxide of zinc, 12.25; and the latter, making two tests, one of 11.30, and the other of 11.31, and that they sent samples of the same to complainant, who suggested that they should postpone sampling until defendants received 200 tons more of ore, which they did, and then sampled and assayed the June and July ores, in all $988^4/_{20}$ tons, and found the aggregate mass to contain a percentage of zinc of 22.06; denying any acknowledgment of erroneous sampling, but admitting that the whole of June and July shipments contained 22.06 percentage per ton of zinc.

Defendants admit that the assay for the August delivery was made by Professor Genth, and say that that was so because Professor Mahan had gone to Baltimore; and say that the September assay was made by George G. Convers, and that from thence he has been the defendants' chemist and assayer, and has made all assays for them. Defendants insist upon the correctness of their sampling and assaying, and deny that the sampling and assaying of complainant is correct; deny that they owe complainant anything, but insist that they have overpaid him on the ores delivered $4,077.99.

The defendants admit serving the notice that they would take possession of the mine after thirty days, and claim they had the right to, and had been guaranteed the possession, and insist that in no month had the complainant delivered the quantity of ore he had agreed to deliver.

Defendants say they were always ready to settle the question of assaying, according to the contract, but that defendant insisted

that his assays were right, and never suggested a resort to the mode provided by the agreement; deny any wish to take possession of said mines, except to secure themselves from loss; say that if complainant had mined properly he could have furnished them 1,000 tons per month of 26 per cent. ore; say that, seeing his inability and inefficiency, they offered to aid him, but their aid was declined; deny that there is any necessity for a change in, or reformation of, said contract.

The defendants also allege that they have sustained heavy damages by reason of the breach of the contract on the part of the complainant, amplifying the allegation by cross-bill, showing how, and giving the amount as very large—over $59,000.

We have here the points of contest between the parties, arising out of an ordinary contract respecting one of the most extraordinary mineral combinations. In general terms, the contract may be said to be very plain, and to require no effort at interpretation. First, the complainant agrees that he is entitled to, and has the possession of, the mine for thirty years; second, that he will deliver to the defendants, on board the cars at Franklin, 12,000 tons of ore in regular monthly shipments of 1,000 tons each; third, that he guarantees that said ore shall contain at least 26 per cent. of oxide of zinc, and that the defendants shall not be compelled to take or pay for any ore containing less than 26 per cent., and if the assays made from time to time by defendants to determine the percentage are not satisfactory to the complainant, he then shall appoint an assayer to test the quality of said ore, and if the two do not agree, then the parties to the agreement shall appoint a third, and if the parties cannot agree, then the two assayers shall appoint the third, whose report shall be final and binding; defendants shall pay $3.75 per ton for every ton containing by assay 26 per cent. of zinc, and fifty cents for every ton containing an additional 1 per cent.; fourth, that if the complainant shall fail for thirty days to deliver the monthly quantity of ore, the defendants may, at their option, after thirty days' notice, take possession of the mine and machinery, and remove therefrom the amount of ore specified, charging the cost to the

complainant, the said complainant guaranteeing to said defendants the possession of the mine until his inability shall be removed; fifth, that at the expiration of the period for the delivery of 12,000 tons, the defendants shall have the privilege of taking regular monthly quantities of said ore for the remainder of the said thirty years, or for a less time, upon notice stating the time and the amount; sixth, that if they elect to take a minimum quantity of 12,000 tons per annum for the additional term, then complainant shall not sell any ores assaying 26 per cent. or over to any other person; seventh, that if said complainant shall obtain possession of any adjoining mine, he will give the defendants the first option of purchasing the ore at the same price and on the same terms above named; eighth, that said defendants shall have the right of storing all ore on the surface at or near the mines free of charge; ninth, that the contract shall terminate in case the ores or mines shall give out, and if the defendants' works shall be destroyed or become useless, they shall have the privilege also to rescind the contract; if, however, the said mines shall be incapable of producing the quantity of ore required, of at least 26 per cent., but shall be capable of producing an inferior quality, the defendants shall have the privilege of taking any quantity of said inferior ore at such rate as may be agreed upon between the parties, such price not to exceed $3.75 per ton, or the market value of said ore as mangan iron ore; tenth, that at all times the defendants may enter upon the premises and inspect them, and if necessary provide such protection for them and their working as to them shall seem fit.

Plainly, although the contract is in respect to an extraordinary matter, the ordinary rules of interpretation must prevail.

The parties are in dispute as to the place where the sampling is to be done, and as to the manner of taking the samples. As to the past, I can see no ground for hesitation. If there be a serious difficulty in determining what the parties intended as to the place of sampling (whether it should be done at Franklin, before delivery, or at Bethlehem), if the place was contemplated at all, they have, by their conduct, wholly relieved.

the court. Sampling and assaying were vital points in the contract to the complainant. Whether the compensation for his risks, expenditures and leases should be the paltry price of mangan iron ore, or $3.75 and upwards, depended upon the correctness and completeness of the sampling and assaying. These involved many thousands of dollars to him. Both the sampling and the assaying were difficult and uncertain in the extreme. It seems that nothing so taxes and tests the skill, knowledge and patience of chemists as the determination, with scientific certainty, of the percentage of the oxide of zinc in a given mass from a particular sample selected from that mass. It is uncertain whether the sample is a fair one or not; there is always room for doubt. And it is uncertain whether the assay is absolutely correct and perfect. Contingencies supervene and thwart all wisdom, ingenuity or tact. The same chemist will reach different results from the same sample and from the same materials; and different chemists of equal celebrity, experience and honesty will obtain results so far apart, from the same samples, as to baffle their own understanding. The difficulty is not in the science of chemistry nor the weakness of the artist, but in the ore. Let anyone examine a score of pieces, large or small, and he will discover the source of trouble, and will have none the less faith in the science. Yet, notwithstanding the uncertainty spoken of, any fair system of sampling, honestly pursued, would, if the assaying were done by any of the gentlemen referred to, reasonably effectuate the intention of the parties under a contract disposing of 12,000 tons of such ore. Each particular effort of the sampler and assayer may not be perfect, but in the end the balances will be even.

The difficulties alluded to were not unknown to the complainant before this contract. He had some knowledge of this ore, its use, its value and of the method pursued in manufacture to make that value most available. He had himself been engaged with a Mr. Dixson, extracting the oxide of zinc from this ore. With this knowledge he entered into this contract. With this knowledge, and only eighteen days after the execution of the contract, he shipped nine car-loads of ore to the defendants,

Trotter *v.* Heckscher.

without asking them to take samples or make assays before de-livery. He took samples of these nine cars at the mine before delivery, but he neither made the fact of so doing known to the defendants, nor did he object to the method of sampling proposed by them after the delivery. These cars were sent on June 22d; on the 24th defendants wrote to complainant, saying:

" Will run through the Blake crusher one cart-load from each car, and will run through the fine crusher one wheelbarrow of each cart-load run through the Blake; from this I will take a number of handfuls over the pile, and from these, when thoroughly mixed together, take samples for analysis. This I suggest as a fair method of arriving at the value of the ore. Shall be pleased to have any suggestions you may have to offer on the subject. I will have analysis made now of the nine cars shipped, in order that you may know how it runs, and as a guide for future shipments. Mr. Dixson thinks it is about the same quality as ore from which he obtained a furnace-yield of 26.8 per cent., and that we can probably work it a little clearer."

To which letter of the 25th the complainant replied

" Your method of sampling and for assay is as good as can be devised, and fair to both."

This letter also shows his knowledge of the ores, and of the method of extraction of the zinc oxide.

These nine cars were sampled, and assays made therefrom by defendants through Professor Mahan. His first trial gave him 11.25 per cent. of oxide of zinc, and the second 12.25. These results were promptly reported to complainant. By another trial, but which, I think, included samples from two hundred tons additional, the defendants showed a result of 22 per cent. The defendants sent portions of their samples to the complainant. One of these portions he had analyzed by Mr. Wendt, whose report showed 31.24 per cent., a vast difference, making, if true, at the rate per month many hundreds of dollars in favor of complainant. This was in July, and it appears that complain-ant did not complain of the modes of the defendants for some time thereafter. But I think he did of their results as reported. When asked how soon he notified the company of his dissatisfac-tion, he said:

Trotter *v.* Heckscher.

" I can't fix the date in my mind, but I think it was before the close of the year."

I think, unless fraud or mistakes be disclosed, the sampling done by the defendants should be adopted as the basis of calculation in ascertaining whether they have paid for all the ores delivered before the commencement of this suit or not. On this point the complainant's acquiescence is all-controlling. The chemist of his own selection discovered, he claims, an error of about nine per cent. in the first shipments for June and July. This he at once understood ; yet he continued to ship ore. As I understand complainant's testimony, he only had one of the samples forwarded to him by the defendants, assayed before sent, and when asked why he did not have the rest, said, " I had no faith in their being correct, or but what they were all doctored up and fixed." With the knowledge which he so promptly acquired, and the want of confidence entertained by him, he had no right to continue delivering ores, if he intended to question the right of defendants to sample at their works, to which he had consented so approvingly in his letter of June 25th, 1881. The law holds him responsible for his delay or indifference. He had all power in his own hands. He could have stopped all deliveries and had his rights determined as well in July or August, 1881, as in May, 1882. The contract provided ample protection for him.

I cannot conclude that reason has been disclosed for impeaching the *sampling* done by defendants on the grounds either of *fraud* or *mistake*.

It will be perceived, then, that up to the filing of the bill, the parties themselves interpreted the contract with respect to the place of sampling, and the right of the defendants to do the sampling, and that the court has adopted their interpretation.

As a necessary consequence, I must accept of the assays made from those samples so far as I believe them to be free from fraud or mistake. The defendants say the following percentages are the correct ones, viz. : June and July ores, 22.06 ; August, 26.28 ; September, 33.60 ; October, 23.88 ; November, 24.87 ; December, 21.40 ; January, 16.70 ; February, 24.70 ; March, 21.90 ; April, 18.60.

Taking the June and July ores, it appears that Professor Mahan made three assays from samples taken from the whole mass, *i. e.* 51 cars; the result, 20.04, 20.03, and 22.07 per cent. Portions of these samples which were forwarded by the defendants to the complainant were, after the commencement of this suit, submitted by counsel of complainant to Dr. Allen for assay, and his test shows 18.15 and 18.37 per cent. Counsel also submitted like portions of the same samples to Dr. Howe, whose figures are 19.71, 18.24 and 18.71 per cent. Other portions of the same samples were, under the direction of the court, submitted to Professor Van Dyke, who reported 18.225, 19.315, and 23.25. All of these, except the last one, are below the rate allowed by the defendants. That rate, 22.06, I shall adopt.

Taking the August ores, it appears that Dr. Genth made three assays from the samples produced, showing 25.48, 29.07 and 29.81 per cent. As in the former case, Prof. Allen made trial and reported 25.62, 29.53 and 30.02, as did Prof. Howe, who reported 25.60, 29.62 and 30.07. From these same ores Prof. Van Dyke reports 25.31, 29.25 and 29.655. The defendants adopt the average of 26.28. But if it be fair to make an average the guide, I think it should be of all the assays of one or the other. Such average of Prof. Genth's efforts is 28.12, of Prof. Allen's, 28.39, of Prof. Howe's, 28.43 and of Prof. Van Dyke's, 28.06. I am inclined to accept the last, since he displayed very great care, but since the defendants selected Dr. Genth as their assayer, and he is so eminent, and since the other two professors, equally distinguished, are still higher, I will adopt the average of the rate named by Prof. Genth—28.12.

Taking the September ores and the assay of Prof. Converse, to whom the defendants committed their samples for that month, and we have a percentage of 33.60. Prof. Allen renders 33.46, Prof. Howe, 33.42 and Prof. Van Dyke, 32.43. I have not met with any reason for rejecting the first rate—33.60. It is the report of the professor chosen by the defendants, and they sought no other.

Taking the October ores and the assay as made by Prof. Converse, there appears a percentage of 23.88; as by Prof.

Trotter *v.* Heckscher.

Wendt, of 23.27; by Prof. Howe, of 27.92, and by Prof. Van Dyke, of 27.85.   How shall this be adjusted?   Which shall I follow?   Which is least likely to be in error?   I think the last. Great care was taken in that assay to be right.   There was trial in duplicate.   It is sustained by Prof. Howe.   It may properly be said that Prof. Converse took duplicates also, and that he is sustained by Prof. Wendt, and this is true; but I have not before me the results of the labors of the latter gentlemen on samples furnished the defendants so numerously as the others, and therefore not the same opportunity to assure my trust in his ability, and, besides, in such case a decision must be rendered, and when all other considerations are equal, the independence or freedom from bias of the witness not unfrequently turns the scale.   Therefore, for October I will adopt the rate of 27.85.

Taking ores for November, Prof. Converse fixes the rate at 24.87; Prof. Howe at 27.17, and Prof. Van Dyke at 26.70. For the reasons which controlled me in the last instance, I will be governed by Prof. Van Dyke's value—26.70.

Taking the December ores, and the same professors present these tests: Converse 21.40, Howe 23.06 and Van Dyke 22.74. I shall take the last—22.74.

Taking January ores, and Professor Converse gives us 16.70, Professor Wendt 16.11 and 19.05, and Professor Van Dyke 23.27.   I am best satisfied with the last—23.27.

Taking February ores, and the report from Professor Converse is 20.70, Professor Howe 29.20, and Professor Van Dyke 28.67.   I shall adopt the 28.67.

The March ores Professor Converse reports at 21.90, Professor Allen 28.50, Professor Howe 28.50, and Professor Van Dyke 27.97.   My guide in accounting will be 27.97.

And the April ores Professor Converse gives at 18.80, Professor Allen 22.32, Professor Howe 22.57, and Professor Van Dyke at 22.18.   I will accept the 22.18.

When the results given by Professor Converse after September are compared with those of Professors Allen, Howe and Van Dyke, the difference is so great as to force the conclusion that there must have been some *mistake* in *assaying* on his part.

Such, at least, is the most decided preponderance of the testimony. I say, in my judgment, there is a mistake on the part of Professor Converse, for I understand his assays were from the same samples used by the other professors; not different samples from the same mass, but one carefully-selected sample.

This settles, according to my view, the amount of ore to be accounted for at the price of $3.75 per ton for such as yielded 26 per cent. and upward.

What of that which yields less? The parties have not contracted with so much certainty on this head. The language used is, that if said mine—

"Shall be capable of producing an inferior quality of ore below the said 26 per cent. of oxide of zinc, the said Charles A. Heckscher  *  *  *  shall have the privilege of taking any quantity of the said inferior ore at such rate as may be agreed upon between the parties, such price not to exceed $3.75 per ton,  *  *  *  or the market value of said ore as mangan iron ore."

The parties are not agreed as to the value. There is no proof of the value in the market of such ores, except as mangan iron ores. The market value of mangan ore is established. But I do not understand that the contract gives to the defendants the absolute right to fix the price of all ores which yield less than 26 per cent. at the market price of mangan iron ore. The insistment of the defendants cannot prevail without changing the position and relation of the last two members of the sentence last quoted, then making it thus:

"At such rate as may be agreed upon between the parties, or the market value of said ore as mangan iron ore, such price not to exceed $3.75 per ton."

Such juxtaposition of the different members connected by the conjunction would give the defendants the benefit of the alternative which they claim, and bring them within the rule approved in *Hurd* v. *Kelly, 78 N. Y. 588.* But the contract is not so written. We must construe it as it stands. The parties have said the inferior ore shall be paid for at a price agreed upon, not to exceed $3.75, or it shall be the market value of iron ore. The highest price per ton was $3.75. If the conten—

Trotter *v.* Heckscher.

tion of the defendants be not correct, as I think it is not, why, then, was the phrase " or the market value of said ore as mangan iron ore " added ?   If it was not added to enable the defendants arbitrarily to fix the price at the market value, however low, of mangan iron ore, then what ore did the parties have in mind at the time?   It seems to me that this phrase was used to fix, beyond question, the lowest price.   The highest had been named, *i. e.*, $3.75.   They decided to name the lowest.   Thus they excluded all discussion beyond certain limits.   I must give place to this phrase and effect.   I can see no other reasonable effect to assign to it than that no ore accepted by the defendants shall be paid for at a less rate than the market value of mangan iron ore.

Supposing this to be right, what shall be the judgment of the court as to the value of the ores shipped in this case which assayed below 26 per cent. of oxide of zinc?   Shall the court, in every case, fix the value at the price or value of mangan iron ore simply because the parties have not agreed?   No; for in that event the court would be arbitrarily doing, to overcome a difficulty, what it believes the defendants cannot do.   Being entirely without proof as to the value of these ores, except as mangan iron ore, which is $1.67 per ton, and that price being considerably more than one-half less than the value of these ores when they yield 26 per cent. oxide of zinc, and the parties agreeing that when they yielded less than 26 per cent. they should not exceed in price $3.75, showing that they contemplated the possibility of their being worth that sum, and they, by their contract, advancing the price at a given rate where the ores exceed 26 per cent. in richness, I feel it clearly my duty to continue the scale downward from the point at which they started upward, and in like proportions, until I reach the market value of such ores as mangan iron ores.   Taking the results of the assays as I have accepted them, we find, in the descent, no ores delivered that have any higher value than that of mangan iron ore.   Under this head, came the ores for June, July and December, 1881, and for April, 1882.

The foregoing, I think, disposes of the principal matters in

dispute at the time of the filing of the bill excepting the right of the complainant to the injunction obtained.

The place of sampling, under the contract, still remains to be determined. In fixing values thus far, for the purpose of accounting, I have found myself influenced by the action of the complainant. On his own motion he shipped nine car loads of ore to defendants, without insisting upon the ore first being sampled and assayed by them, to ascertain its value; and although he afterwards expressed dissatisfaction with the sampling and assaying, yet he shipped again and again for nine months, and then ceased shipping, as I understand the case, not because the defendants did not do their sampling before delivery, but because they did not account and pay for all the ore which had been delivered. After all this, and after the complainant had been invited to visit the works of the defendants and witness their methods, and had declined, and after it had, in the nature of things, become impossible for the defendants to make sampling or assaying before delivery, or to inspect the manner of sampling adopted by the complainant, I consider it too late to reject the sampling of defendants; especially where they had in the most open and frank way left their hands open to the complainant and given him every chance to judge of the honesty and correctness of their proceeding, and more especially when it appears that they are still able to produce before the court portions of the same samples, of the value of which the court, by the aid of the most trusted experts, can judge.

But counsel for the complainant insists that, though the complainant's conduct should furnish a guide to the court's judgment in fixing values prior to filing the bill, such conduct did not irrevocably determine his course, but that he could change his conduct and stand upon the agreement. In this, as a general principle, I agree with the counsel of the complainant. I suppose if there were serious doubt upon the question involved, the uniform and unhesitating action of the parties at the commencement of the fulfillment of the contract continued some months, would of itself relieve the court of any embarrassment as to what the parties intended, or as to what its decree should be. But where

Trotter v. Heckscher.

there is no reasonable doubt as to the order of events contemplated by the parties as expressed on the face of the instrument, a course of conduct running through a few months should not seal the course of action for all time to come, if the contract speaks to the contrary. I think I have now before me such a case.

Therefore, the question now is, When that agreement was executed, when and where did the parties intend to have the sampling and assaying done? Were these things to be done at the mines, before the delivery to the defendants, or at the works of the defendants at Bethlehem, after delivery? It is of some value to observe that prior to and at the time of executing the contract, the defendants had possession of the works at Bethlehem for the manufacture of zinc, which included the best known apparatus for sampling such ores. These facts were known to the complainant. He also knew that the defendants wanted franklinite ores for the purpose of manufacturing such oxide of zinc as only can be made from that ore. He knew or supposed he knew the characteristic qualities of that ore. I am so convinced of this that I believe had anyone questioned his knowledge it would have been regarded as a high offence by him. I would not say this did I not believe that the complainant is a most thoroughly conscientious man, and as self-reliant as he is conscientious. He did not want any one to tell him the nice shades of difference between different parcels of these ores. He had handled ores and had manufactured zinc, and could he not tell what the fire and the furnace would produce? He was acting upon his own instructed and enlightened understanding, and he was ready to contract for the delivery of ores that would produce by assay 26 per cent. of oxide of zinc, and to guarantee that it would produce that rate. What I mean is, that the complainant thought that he so well understood these ores that he would have no difficulty in furnishing ores of the required grade, and hence " guarantees that all the said ores so to be delivered as aforesaid shall contain at least 26 per cent. of oxide of zinc." It seems to me that if the value was to have been determined before delivery by the defendants, no such clause as that first quoted would have been thought of or inserted. Wherefore

should Mr. Trotter guarantee the value to be at least 26 per cent. if the contract provided that Mr. Heckscher should ascertain its value before Mr. Trotter delivered it? If the agreement provided for an actual test before there was any liability to attach, then the guaranty clause is without application and wholly nugatory.

To my mind, at least, this view is strengthened by what may be gathered from the memorandum for the agreement made and signed by Mr. Trotter, on May 26th, and from the agreement itself, made and signed on June 2d. The former provides that " the percentage of the oxide of zinc is to be determined by two as- says of an average sampling of every 1,000 tons shipped, one made by each party hereto," and in case of disagreement providing for a third assayer; the latter provides that " if the assays taken from time to time by the said Charles A. Heckscher, * * * to determine the percentage of oxide of zinc, are not satisfactory to the said Charles W. Trotter, * * * then the said Charles W. Trotter shall appoint an assayer to test the quality of said ore as to the percentage of oxide of zinc," also providing for a third assayer in case of disagreement. These two items show that the contracting parties at first contemplated making an assay each for himself, but afterwards decided to avoid all that formality, and resolved that the duty of delivering ore of the grade of 26 per cent. should devolve on Mr. Trotter, and of as- certaining its actual value upon Mr. Heckscher, which course admits of it being done at the works of defendants.

It has been urged that this view is unreasonable and inequita- ble. Considering it as I have, it would be a sufficient answer to say that I find it so in the contract, made by a highly intelligent and capable man; and since he comes into equity to ask the aid of the court to enforce the contract, he should not be heard when he asks the other party to submit to an agreement which he himself declares inequitable, for what he now asks, if enforced, would only be a reversal of the situation of the parties. But I do not find the agreement in this regard unreasonable or in- equitable. Excepting a question of personal convenience, the contract is as full and fair as it can be. It is not so convenient for Mr. Trotter to have an expert at Bethlehem, perhaps, as at

the mines.   It would not be so convenient for Mr. Heckscher to erect his sampling-works at the mines and have his sampler there in attendance.   But this I cannot consider, for the parties determined it by their agreement.   And this I say is fair. There is ample protection to Mr. Trotter.   There is an express provision for an expert to make assays in the interests of Mr. Trotter, or at his instance, in case he is dissatisfied, and in case of error, the party in the wrong shall bear all the expenses.

It will at once be perceived that these conclusions lead me to the adoption of the results certified to by the manager since his appointment, and which has been the basis of payment.

Perhaps I ought to express my judgment as to the side on which is to be found the preponderance of testimony upon the question of sampling.   It seems to me to be greatly in favor of the method used at Bethlehem.   I rely entirely upon the testimony of the experts.

I have not been unmindful of the force of the position taken by the counsel of complainant, wherein they insisted that defendants were liable for all ores shipped, at the rate of $3.75 per ton, whether they assayed 26 per cent. of zinc oxide or not, because, by the terms of the contract, title passed to the defendants as soon as the ores were placed on board the cars at Franklin.   As this controversy stands before me, I think it is not so much a question of *where* the title passed, as it is as to the value of what did pass.   All the ores which were shipped by the complainant were used by the defendants, and they must pay for them.   The complainant agreed that he would accept of certain rates for the ore when ascertained; he certainly cannot ask anything more.   I can conceive of no event in which a court of equity would compel a defendant to pay for more than he actually received under his contract of purchase.   The contract is that the defendants shall pay for all ores delivered on board the cars a certain price, according to their value in oxide of zinc, which value is to be ascertained by the defendants, after the delivery, by *assay* made from *samples*.   Under the law, I think the title passed so far as to cast the risk of loss on defendants (though this is not decided, because not a question in the

case, but only referred to to illustrate), yet the proof shows that the *weight* of the ores, as well as their value in zinc, was not ascertained until they had been carried several miles by rail. The parties so contracted, and an examination of many cases satisfied me that not one can be found which will compel the defendants to pay for ore until the defendants themselves have had a reasonable opportunity of ascertaining what percentage of zinc it contains by assay from samples. Yet, perhaps I ought to say that there are cases which show that property would not pass under this contract on delivery on board the cars, because something remained to be done, one of which is *Stephens* v. *Santee, 49 N. Y. 35,* which is in conformity to the third rule laid down by Benjamin in his work on Sales, book 2 ch. 3.

There was a difference between the parties as to the tonnage of ore for April, 1882. I think the testimony shows the amount was 1,096.07.

I will advise an accounting in accordance with the views above expressed. Unless the parties agree as to what the result will be, I will advise a reference to a master to make the calculation.

I will not advise that the injunction now in force be made perpetual; nor do I deem it wise to advise its dissolution. Nor would it be prudent or consistent with established rules for the court to take one step further towards enforcing this contract than by its restraining powers to prevent either party from violating its provisions by positive infractions. The injunction will remain. Either party will be at liberty to move the court for relief by petition, upon any branch of the case embraced within the scope of the present bill. Mr. Trotter has a right to mine the ore himself. There are difficulties—difficulties which render it impossible for him, or for any one, to render 1,000 tons per month, without an expense that would be almost ruinous. That more ore *could* have been produced is most plain; yet it is equally plain to have produced the stipulated quantity per month, of the standard value, from the pinched or narrow veins, removing, as was absolutely necessary, the immense amount of useless material, would have made it very costly to Mr. Trotter.

How far he *was* bound to go in order to execute his part of the contract in this respect, I do not pretend to decide. I purposely avoid that consideration. But I allude to the part to show that I have the difficulties attending the task in my mind, where I say that Mr. Trotter has the right to dig these ores himself. The court is bound to let him try. Do the defendants say he has had a fair trial? But after what has passed and been presented to the court, since the filing of the bill, I do not hesitate to say that Mr. Trotter ought to be permitted to try again. If there is any profit to him in the way of economy he is entitled to it. A slight extravagance might at once exhaust all the advantages of the enterprise to him. This should not be if he *can* succeed. I say *if he can*, for I do not forget that Mr. Trotter entered into a solemn agreement to furnish a fixed amount of ores each month. But it must not be overlooked that the agreement, on its face, shows that the parties considered that they were contracting about something that was out of sight, or about a possibility of that something being so reduced as to be worth nothing, or becoming wholly exhausted. Now, I do not think, *looking to the future,* and basing the view on the revelations made since May, 1882, that it would be quite right or equitable to allow the defendants to take possession of that mine, and, at *all hazards,* extract 1,000 tons of ore each month, charging the cost to Mr. Trotter. In saying this I do not mean to be understood as giving the slightest encouragement to indifference or neglect or inefficiency on the part of Mr. Trotter. I only say that I consider myself wholly justified in permitting him to try again—and try, too, without acting under any agency or management of any court. I will not advise the continuance of a manager. The duty of Mr. Trotter is plain. It is his boast, and, I think, a most reasonable one, that he can execute this contract. He has had, through his agents, large experience. For eighteen months he and they have been under the instruction of the most careful management that the court or the state could afford. The very means which the court have invoked to execute this contract are at his command. He need not fail. If he lacks

either wisdom or experience, let him ask.   Then, I doubt not, he can reasonably perform his contract.

These same observations apply to the sampling and assaying. The contract is not silent on these points of interest.   If the defendants fail on this head they do it at their peril.   The contract expressly provides the right of review by the complainant at the expense of the defendants, in case of error.   Their work on these heads must be openly done.   If the complainant desires to be present at the sampling he has a right to be, either in person or by his agent.   He has a right to select such portions of the samples taken for assay as he desires, if applied for in reasonable time.   If, in these respects, the defendants do not abide by the contract, the court will, at any time, interpose.

I have given this case the attention which its importance demands.   I feel unable to go any farther, or to do anything less, on either side.   It may be said on both sides that these conclusions are needlessly cautious; but at no step have I felt that I could offer any justification for exchanging the *voluntary agreement* of the parties for the *arbitrary will* of the court.

As to the damages which the defendants insist upon, as above intimated, I avoid expressing any opinion.   Under the circumstances of the case, and considering the allegations of the cross-bill, and the fact that no demurrer thereto was taken, I thought it my duty to admit evidence which otherwise would have been inadmissible.   As the case stands, all that the course of practice in this court will allow is for the enforcement of the decree in this court to be held in abeyance (in case it should be in favor of the complainant) until the defendants can establish their damages at law.   I will so advise.

*Mr. Chas. D. Thompson,* and *Mr. George Northrop,* of Philadelphia, for defendants.

I. The complainant, at the time of filing his bill in equity, June 8th, 1882, was and is entitled to an account for ores delivered to the defendants.

II. He was entitled to the payment of the amount therein stated.

Where the law casts a duty on a party, the performance shall be excused if it be rendered impossible by the act of God, but where a party, by his own contract, absolutely engages to do an act, it is deemed to be his own fault and folly that he did not thereby expressly provide against contingencies and except himself from responsibility in certain events; and in such case, therefore, that is, in the instance of an absolute and general contract, the performance is not excused by an inevitable accident or other contingency, although not foreseen by or within the control of the party. *Chitty on Cont.* (6th Am. ed. 1844) p. 734, ch. 5 § 5 and cases there cited; *Paradine* v. *Jane, Aleyn* 27; *Hadley* v. *Clarke, 8 T. R.* 259, 267; *Atkinson* v. *Ritchie, 10 East* 533; *Bullock* v. *Demmitt, 6 T. R.* 650; *Hulings* v. *Craig, Addis.* 342; *Gilpin* v. *Consequa, 1 Pet. C. C.* 91; *Youqua* v. *Nixon, 1 Pet. C. C.* 221; *Alexander* v. *Smith, 4 Dev.* 364; *Cutter* v. *Powell, 2 Smith's Lead. Cas.* 1; *Leake on Contracts* 693; *Nichols* v. *Marstand, L. R.* (2 Exch.) 4; *Ford* v. *Cotesworth, L. R.* (4 Q. B.) 134; *7 Mass.* 325.

III. Complainant was entitled to suspend deliveries of ore until payment made to him of amount stated in decree. *Simpson* v. *Crippen, L. R.* (8 Q. B.) 14, overruling *Hoare* v. *Rennie, 5 H. & N.* 19; *Haines* v. *Tucker, 50 N. H.* 307; *Benjamin on Sales* § 800.

Where there is a contract to deliver merchandise in installments of specified quantities at a fixed price for each installment, the law regards such a transaction as constituting several distinct or independent contracts, and substitutes for the remedy of rescission for a partial breach of either of the contracting parties, a right to compensation for the partial breach. *Lucesco Oil Co.* v. *Brewer, 66 Pa.* 355; *Scott* v. *Kittanning Coal Co., 89 Pa.* 231.

The future delivery of ore after a breach to pay by vendee, is a waiver of the right to rescind, even if such right existed. *Morgan* v. *McKee, 77 Pa.* 229; *Graver* v. *Scott, 80 Pa.* 88; *Stoddart* v. *Smith, 5 Binn.* 355; *Tipton* v. *Teitner, 20 N. Y.* 423; *Snook* v. *Fries, 19 Barb.* 313; *Jonasson* v. *Young, 4 B. & S.* 297; *Rober* v. *Johnson, L. R.* (8 C. P.) 167; *Freeth* v.

Trotter *v.* Heckscher.

*Burr, L. R. (9 C. P.) 208; Mersey Steel and Iron Co.* v. *Naylor, 53 L. J. (Q. B.) 497.*

IV. and V. That defendants were not entitled to take possession of the mine, they not having accounted or paid for the ore theretofore delivered to them, and that complainant was and is entitled to an injunction and the continuance of the same.

If the court is of opinion that the injunction was improperly granted, or that the case made by the plaintiff is contradicted or not supported, it will order the injunction to be dissolved either with or without costs, as the justice of the case may appear to require. *Hudson* v. *Maddison, 12 Sim. 416; 3 Dan. Ch. Pl. & Pr. 1896.*

On application to dissolve an injunction the court confines itself exclusively to the consideration of the combination of facts set forth in the bill out of which the equity of the injunction arises, and to the answer of the defendant to these facts. *Canal Co.* v. *Railroad Co., 4 Gill & Johns. 1.*

Where the defendant, against whom the *gravamen* of the charge rests, has fully answered the complainant's bill, the injunction will be dissolved even though other defendants have not answered. *Vliet* v. *Lowmason, 1 Gr. Ch. 404; Price* v. *Clevenger, 2 Gr. Ch. 207; Stoughtenburg* v. *Peck, 3 Gr. Ch. 446; Gregory* v. *Stillwell, 2 Hal. Ch. 51; Adams* v. *Hudson Co. Bank, 2 Stock. 535.*

That the continuance of the injunction will work a great injury to the defendant has great weight with the court in the consideration of the question whether the injunction should be continued. *Furman* v. *Clark, 3 Stock. 135; Scanlan* v. *Howe, 9 C. E. Gr. 277.*

Where the facts on which the equity of the bill rests are fully denied the injunction will be dissolved. *Still* v. *Hilton, 3 Stew. Eq. 579, 587, affirmed in 4 Stew. Eq. 285; Scott* v. *Ames, 3 Stock. 261; Greenin* v. *Holly, 1 Stock. 137.*

VI. and VII. There appear to be actual mistakes in the assays made by defendants' chemist from October, 1881, to April, 1882.

VIII. Whilst the ore with over 26 per cent. of oxide should be accounted for under the contract, that which contains less than 26 per cent. should have its price subject to deduction of fifty cents per ton for every per cent. below 26 per cent., and at the same rate for fractions of a per cent., unless, by such deduction, the price shall fall below $1.67, which is adjudged to be the value of said ore as mangan iron ore, in which case said last price shall be allowed.

IX. The sampling done by the manager should govern values for any month.

X. The complainant is entitled to a balance of $4,952.51 remaining in the court below.

XI. Said court has no jurisdiction to determine the claims for unliquidated damages made by the cross-bill; that if there are any such claims the defendants should be remitted to an action at law. *1 Dan. Ch. Pr. (ed. 1846) ch. 31 pp. 1742, 1743, 1744.*

A cross-bill is always necessary when the defendant is entitled to some positive relief beyond what the scope of the plaintiff's suit will afford him. *Whyte* v. *Arthur, 2 C. E. Gr. 521; French* v. *Griffin, 3 C. E. Gr. 279.*

As a cross-bill is considered a mode of defence, or a proceeding to procure a complete determination of a matter already in litigation in the court, the plaintiff therein is not obliged to show any ground of equity to support the jurisdiction of the court. It is treated as a mere auxiliary suit or as a dependency upon the original suit. *1 Dan. Ch. Pr. 1746, 1747; Cartwright* v. *Clark, 4 Metc. 104; Story Eq. Pl. § 399; Mitford Eq. Pl.' (Jeremy) 81, 82; Burgess* v. *Wheate, 1 Eden 190; Doble* v. *Potman, Hard. 160; Kemp* v. *Mackrell, 3 Atk. 812; 1 Dan. Ch. Pr. 1751; Troup* v. *Haight, 1 Hopk. 239; Taylor* v. *Merchants Fire Ins. Co., 9 How. 390; Motteaux* v. *London Assurance Co., Atk. 545; Perkins* v. *Ins. Co., 4 Cow. 646; McGowan* v. *Remington, 2 Jones (Pa.) 56; Kames Principles of Equity 159.*

If a case be once properly before the court it will do all in its power to settle the rights of all the parties in the matter in con-

41

troversy, even as between defendants, justly and equitably by one decree. *Decker* v. *Caskey, Sax. 427 ; Couse* v. *Boyles, 3 Gr. Ch. 213 ; Disborough* v. *Outcalt, Sax. 298 ; Shannon* v. *Marselis, Sax. 413 ; Ames* v. *New Jersey Franklinite Co., 1 Beas. 66 ; Vanderveer* v. *Holcomb, 2 C. E. Gr. 87, 547 ; Williams* v. *Winans, 7 C. E. Gr. 573, 577 ; Youmans* v. *Youmans, 11 C. E. Gr. 149 ; Condict* v. *King, 2 Beas. 375 ; Mount* v. *Potts, 8 C. E. Gr. 188 ; Mosser* v. *Pequest Mining Co., 11 C. E. Gr. 200 ; Stevens* v. *Stevens, 9 C. E. Gr. 77.*

A court of equity will settle unliquidated damages. *Coster* v. *Monroe Co., 1 Gr. Ch. 467 ; Copper* v. *Wells, Sax. 10 ; Berry* v. *Van Winkle, 1 Gr. Ch. 269.*

Set-off is a distinct head of equitable jurisdiction and was borrowed from the Roman law, where it was known as *compensatio,* by which term it was first called in England, or the privilege of compensation. For a succinct history of set-off, see *Kames Principles of Equity 201 ; Greene* v. *Nat. Security Bank, 1 Leg. N. 25.*

If complainant desired to prevent the consideration of cross-bill, he should have demurred or objected in his answer ; not having done so, he is now too late. *Gifford* v. *Thorn, 3 Hal. Ch. 90 ; Seymour* v. *Long Dock Co., 5 C. E. Gr. 396, 407 ; 1 Dan. Ch. Pr. 555, 630 ; Ludlow* v. *Simon, 2 Caines's Cas. 56.*

In this case the court can consider and assess damages claimed by defendants. *Denton* v. *Stewart, 1 Cox 258 ; Greeneway* v. *Adams, 12 Ves. 395 ; Phillips* v. *Thompson, 1 Johns. Ch. 150 ; 2 Fonb. 441 ; Hedges* v. *Everard, 1 Eq. Cas. Abr. 18 pl. 7 ; Cudd* v. *Rutter, 1 P. Wms. 570 ; Errington* v. *Aynesly, 2 Bro. C. C. 341 ; Mason's Appeal, 20 P. F. Smith 26 ; Andrews* v. *Brown, 6 Cush. 130 ; Jervis* v. *Smith, 1 Hoff. Ch. 470 ; Nagel* v. *Newton, 22 Gratt. 814 ; Oliver* v. *Crosswell, 42 Ill. 41 ; Smith* v. *Kelley, 56 Me. 64 ; Symes* v. *Strong, 1 Stew. Eq. 131 ; Decker* v. *Caskey, Sax. 427 ; Duryee* v. *Lindsheimer, 12 C. E. Gr. 366.*

In addition to the above, see the following cases, in each of which the several courts of chancery directed the master to assess

damage for the breach of contract.   *Cudd* v. *Rutter*, 1 P. Wms.
572 ;  *Packhurst* v. *Van Courtland*, 1 Johns. Ch. 286 ;  *Phillips*
v. *Thompson*, Id. 150 ;  *Woodcock* v. *Bennet*, 1 Cow. 713 ;  see
*Fonb. Eq. 43 ;  McCallum* v. *Germantown Water Co.*, 54 Pa. St.
56 ;  *Basset* v. *Johnson*, 2 Gr. Ch. 417 ;  2 Dan. Ch. Pr. 1086.

How shall the defendants' loss be ascertained so as to be compensated ?   Several ways are proper.   The court can either send
a reference of the matter to a master, or issue a writ *quod damnifactus*, or settle the question itself.

1. Therefore, equity can decree damages for breach of contract.

2. That such damages can be ascertained by a master, or by
an issue, at the court's discretion, or by the chancellor himself.

3. That equity, having assumed jurisdiction of this case, will
proceed to do this.

4. That the relief prayed in the cross-bill can be sustained on
two equitable grounds, to wit, set-off and account.

5. That we have no adequate remedy at law, and the plaintiff,
by his own admission, is irresponsible in damages, and does not
reside in New Jersey.

6. That set-off is permissible by cross-bill.

7. That in a cross-bill no equity need be shown

8. Will the court, after this prolonged and expensive litigation, chiefly in the ascertainment of damages, leave Trotter in
possession of the mines, with an officer of the court forcing him
to fulfill his contract, and largely at our cost ; protect him in his
defaults, and refuse the defendants their clearly-proved damages.

9. After argument the court below allowed testimony to be
given by defendants as to their damages and allegations in
cross-bill.

Defendants claim damages for the breach of contract arising,
in seven ways.

1. On account of deficiency of quantity of ores.

2. On account of deficiency in quality of ores.

3. On account of non-delivery of any ore whatever from
April 29th, 1882, to middle of August, 1882.

4. On account of losses and damages sustained thereby in loss

of market and loss of profits, and expense entailed in trying to obtain ores elsewhere, and damages sustained by inability to fulfill contracts for resale.

5. On account of non-delivery on board of cars, compelling defendants to carry the ore to the cars.

6. On account of over-payment to Trotter.

7. For interest on above items.

A party in default is liable for those special damages fairly in the contemplation of the parties to the agreement. *Hadley* v. *Baxendale, 9 Exch. 341, 354; S. C., 23 L. J. (Exch.) 179; Griffen* v. *Colver, 16 N. Y. 489; Hinke* v. *Liddell, L. R. (10 Q. B.) 265; Hauser* v. *Pearce, 13 Kan. 104; Prosser* v. *Jones, 41 Iowa 674; McHose* v. *Fulmer, 73 Pa. 365; Bank of Montgomery* v. *Reese, 2 Casey 143; Miller* v. *Mariners Church, 7 Me. 55; Alder* v. *Keigley, 15 M. & W. 117; Hammer* v. *Schoenfelder, 47 Wis. 455.*

Profits are included. *Masterson* v. *Brooklyn, 7 Hill 62; Messmore* v. *N. Y. S. & L. Co., 40 N. Y. 422; Suth. on Dam. 82, et seq.; Clark* v. *The Mayor, 3 Barb. 288; Davis* v. *Tallcot, 14 Barb. 611; Fletcher* v. *Tayleur, 17 C. B. 21; Dunlop* v. *Higgans, 1 H. of L. Cas. 381.*

When there is no market in which to purchase a like article, profits of resale are included in measure of damages. *Borries* v. *Hutchinson, 18 C. B. (N. S.) 445; S. C., 34 L. J. (C. P.) 169.*

Where there is a warranty, plaintiff may recover damages sustained by inability to fulfill contract of resale. *Randall* v. *Raper, E., B. & E. 84; S. C., 27 L. J. (Q. B.) 266; 2 Suth. on Dam. 422 &c.; Benj. on Sales § 903;* see, also, *1 Suth. on Dam. 74, 75, 79, 80, 91, 92, 93, 106, 107, 108, 110, 130, 134, 148, 151, 154, 187; McHose* v. *Fulmer, 73 Pa. St. 365; France* v. *Gaudet, L. R. (6 Q. B.) 199; Griffin* v. *Colver, 16 N. Y. 494; Haskell* v. *Hunter, 23 Mich. 305; Crater* v. *Binninger, 4 Vr. 517; Wolcott* v. *Mount, 9 Vr. 496.*

XII. Trotter is entitled to retain possession of the mine so long as he shall furnish from the same the quantity and quality of ore provided for by the contract, and in case the mine is not.

·able to furnish so much, then as long as he causes the same to be fully and fairly worked.

XIII. The balance due to Trotter for ores delivered before the commencement of this suit is $6,790.55, with interest from May 1st, 1882; that there is due from defendants to the complainant the sum of $6,272.31; that the defendants do pay the complainant the sum of $6,272.31, with interest.

XVI. Defendants pay to complainant the costs of this suit to be taxed, and half of the expenses of the manager. *Hann* v. *McCormick, 1 South. 109, 111; Reeve* v. *Eft, 2 Vr. 139, 141; State* v. *Blake, 7 Vr. 443; Dewees* v. *Manhattan Ins. Co., 5 Vr. 253; Cox* v. *Bennett, 1 Gr. 165.*

XVII. The manager shall see that the defendants pay to the ·complainant, for the ore delivered in each month thereafter, on the 15th day of the next succeeding month.

XVIII. The clerk of the court shall pay the manager the ·sums named for mining expenses, out of the fund in court, as founded on the three orders filed April 24th, 1883, April 20th, 1883, and June 23d, 1883.

XIX. The suspension of the order for the payment of money into court, and orders that all moneys therein referred to thereafter becoming due, should be paid to the complainant, founded ·on two orders filed July 13th, 1883, and August 20th, 1883.

*Messrs. Cortlandt & R. Wayne Parker* for respondent.

The opinion of the court was delivered by

DIXON, J.

The rights of the parties to this controversy grow out of the following contract under seal :

" This indenture, made the second day of June, A. D. one thousand eight hundred and eighty-one, between Charles W. Trotter, of the city of Brooklyn and state of New York, of the one part, and Charles A. Heckscher, of the city of Philadelphia and state of Pennsylvania, coal-miner and shipper of ·coal, of the other part, witnesseth : That whereas one James L. Curtis, of the ·city of New York, sole surviving trustee of the Franklinite Mining Company, ·did, by indenture bearing date the sixth day of March, A. D. one thousand

eight hundred and seventy-seven, grant, convey, demise and to farm let to the said Charles W. Trotter, and to his heirs and assigns, for the full term of thirty years, all that certain mine, vein, lode and bed of franklinite ore, together with the appurtenances, in the county of Sussex, in the state of New Jersey, more fully set forth and described in said indenture:

"Now, this indenture witnesseth: That the said Charles W. Trotter, for and in consideration of the sum of one dollar, to him well and truly paid, the receipt whereof is hereby acknowledged, and of the covenants hereinafter made by, and on the part of, the said Charles A. Heckscher, hereby, for himself, his heirs, executors and administrators, covenants, promises and agrees to and with the said Charles A. Heckscher, his associates, executors, administrators and assigns, as follows:

"*First.* That he, the said Charles W. Trotter, is in undisturbed and undisputed possession of the premises mentioned in the said indenture or lease of March sixth, A. D. one thousand eight hundred and seventy-seven, and has all the rights and privileges for the term of thirty years from the said sixth day of March, A. D. one thousand eight hundred and seventy-seven, to enter into this indenture and execute the covenants herein.

"*Second.* That he, the said Charles W. Trotter, his executors, administrators or assigns, shall and will deliver to the said Charles A. Heckscher, his associates, executors, administrators and assigns, on board the railroad cars at Franklin, Sussex county, and state of New Jersey, twelve thousand tons (each ton being of the weight of two thousand two hundred and forty pounds) of franklinite ore, in regular monthly shipments of one thousand tons, or thereabouts, each month, commencing from the date of this agreement, the said monthly deliveries not to fall short of nine hundred and ninety tons, nor be in excess of one thousand and ten tons; and furthermore, that neither the said Charles W. Trotter nor his executors, administrators or assigns, or any of them, will, during the continuance of this agreement, sell, furnish or deliver to any person or persons any of the ore of said mine, vein, lode or bed, or make any contract so to do, of a quality equal to or exceeding twenty-six per cent. of oxide of zinc.

"*Third.* That the said Charles W. Trotter, for himself, his heirs, executors, administrators and assigns, hereby guarantees that all the said ore so to be delivered as aforesaid, shall contain at least twenty-six per cent. of oxide of zinc, and the said Charles A. Heckscher, his associates, executors, administrators or assigns, shall not be compelled to take or pay for any ore containing less than twenty-six per cent. of oxide of zinc, and if the *assay* made from time to time by the said Charles A. Heckscher, his associates, executors, administrators and assigns, to determine the percentage of oxide of zinc, are not satisfactory to the said Charles W. Trotter, his executors, administrators and assigns, then the said Charles W. Trotter shall appoint an assayer to test the quality of said ore as to the percentage of oxide of zinc, and in case the said two assayers shall not agree as to the percentage of said oxide of zinc, then the said parties hereto shall jointly appoint some third person—a disinterested, competent chemist of respectable standing—to determine the percentage of

.Trotter v. Heckscher.

said oxide of zinc, and if the said parties hereto shall not agree in the selection of said third person, then and in such case the two persons appointed to make the assays, as aforesaid, shall jointly appoint some third person—a disinterested, competent chemist of respectable standing—to determine the percentage of said oxide of zinc, whose report and decision shall be final and binding upon both parties. The expense of such final assay to be paid by the party hereto whose assay was most in error. And the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall pay to the said Charles W. Trotter, his executors, administrators and assigns, three dollars and seventy-five cents per ton for every ton of said ore containing by assay twenty-six per cent. of oxide of zinc, and the further sum of fifty cents per ton for every ton containing an additional one per cent. of said oxide of zinc over and above the said twenty-six per cent. per ton, or the proportion of said fifty cents for any fractional percentage, and the payment for all ores received shall be made in cash, on the fifteenth day of each month, for the ores delivered during the previous month, in New York or Philadelphia funds, according to the option of the said Charles A. Heckscher, his associates, executors, administrators and assigns.

"*Fourth.* That if at any time during the continuance of this agreement, the said Charles W. Trotter, his heirs, executors, administrators or assigns, shall fail for thirty days to deliver the monthly quantity of ore, as above agreed upon, the said Charles A. Heckscher, his associates, executors, administrators and assigns, may, at his or their option, after thirty days' notice to the said Charles W. Trotter, take possession of the mine, vein, lode or bed of franklinite ore, and all machinery, tools and appliances necessary and required to be used in connection with said mine and works, and shall have the free and uninterrupted right and privilege of entering into and upon the said premises, and any and all parts thereof, and shall have the full and uninterrupted right and privilege of taking therefrom and applying the amount of ore above specified to his and their own use, charging to the said Charles W. Trotter the cost of said mining and of the delivery of said ores on board the cars, he, the said Charles W. Trotter, paying for the same. And the said Charles W. Trotter hereby, for himself and his heirs, executors, administrators and assigns, guarantees that the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall have peaceable and uninterrupted possession of said mine, vein, lode or bed of franklinite ore until the inability or failure of the said Charles W. Trotter to supply said ore as agreed upon shall be satisfactorily removed. And during such occupation and working of said mine, vein, lode or bed of franklinite ore, the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall have the privilege and right either to employ the workmen there engaged, or to dismiss them, or any of them, and employ others.

"*Fifth.* That at the expiration of the time limited in this indenture for the taking of the said twelve thousand tons, the said Charles A. Heckscher, his associates, executors, administrators and assigns shall have the right, option and privilege of taking thereafter regular monthly quantities of said ore for

the remainder of the term of the said lease to the said Charles W. Trotter, his heirs and assigns, or for a less time, as the said Charles A. Hecksher, his associates, executors, administrators and assigns, may determine, upon giving to the said Charles W. Trotter, his executors, administrator or assigns, notice in writing to that effect, stating the extension of time desired, the amount of ore to be taken, and the time when said ore is to be taken—the said ore to be delivered of the same quality and under the same guaranties, conditions and prices as the twelve thousand tons aforesaid, and subject to the same terms as to tests, assays and the method of determining the same, with the same rights and privilege of taking possession and mining as is before provided herein, and on the same terms and conditions.

"*Sixth.* That if the said Charles A. Heckscher, his associates, executors, administrators or assigns, shall elect to take, after the expiration of the term for the delivery of the twelve thousand tons above mentioned, a minimum quantity of twelve thousand tons of said ore per annum for the additional term, which they have an option under section 5 of this indenture, then and in that case the said Charles W. Trotter hereby, for himself, his heirs, executors, administrators and assigns, covenants and agrees not to sell or dispose of any ores assaying twenty-six per cent. or over of oxide of zinc, to any other person or persons, or corporation or corporations.

"*Seventh.* That if the said Charles W. Trotter, his executors, administrators or assigns, shall obtain possession of any adjoining mine, vein, lode or bed, or any portion thereof, he or they shall and will give to the said Charles A. Heckscher, his associates, executors, administrators and assigns, the first option of purchasing the ores therefrom, for the same price and under the same terms, conditions and stipulations, in every respect, as are herein expressed in reference to the twelve thousand tons above mentioned.

"*Eighth.* That the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall have the right and privilege of storing all ore obtained hereunder on the surface of the property held by the said Charles W. Trotter, at or near the mines, free of charge therefor.

"*Ninth.* That this contract shall terminate and be considered void in case the ores or mines shall give out or become exhausted, and if the Lehigh Zinc Works shall be destroyed or become useless, the said Charles A. Heckscher, his heirs, associates, executors, administrators or assigns, shall have the privilege, if he or they desire it, also to rescind this contract, and all his and their obligations thereunder. If, however, the said mines shall be incapable of producing the quantity of ore required by this agreement of at least twenty-six per cent. of oxide of zinc by assay, but shall be capable of producing an inferior quality of ore below the said twenty-six per cent. of oxide of zinc, the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall have the privilege of taking any quantity of the said inferior ore at such rate as may be agreed upon between the parties, such price not to exceed three dollars and seventy-five cents per ton of two thousand two hundred and forty pounds, or the market value of said ore as mangan iron ore.

"*Tenth.* At all times during the continuance of this agreement and the ex-

Trotter v. Heckscher.

tension thereof, the said Charles A. Heckscher, his associates, executors, administrators or assigns, shall have full power and authority to enter into and upon the mines and premises herein mentioned, and inspect and examine the same, and provide, if it should be necessary, such protection and security for them and their proper workings as to the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall seem fit and proper.

"In witness whereof the parties hereto have hereunto set their respective hands and seals the date first above mentioned.

"Charles W. Trotter.     [l. s.]
"C. A. Heckscher.     [l. s.]

"Signed, sealed and delivered in the presence of us. The words, 'by assay,' first interlined between the twenty-third and twenty-fourth lines of the third page, and between the sixteenth and seventeenth lines of the seventh page, and the words, 'or the market value of said ore as mangan iron ore,' between the twenty-fifth and twenty-sixth lines of the seventh page.

"George Northrop.
"Wm. Bracken."

On June 8th, 1882, Charles W. Trotter filed his bill of complainant against Charles A. Heckscher and his assigns, the Lehigh Zinc and Iron Company, Limited, praying a decree that the foregoing contract required the defendants to determine, before the delivery upon the cars at Franklin of the ores mined under the contract, whether or not they would take the said ore, and therefore whether or not the same contained as much as 26 per cent. of oxide of zinc, and hence that it was the duty of the defendants to cause an assay to be made on or prior to the delivery, and to report the same to the complainant, or that, in default thereof, the reception of said ore by the defendants concluded them, and estopped them from denying that the ore contained at least 26 per cent. of zinc oxide, and was to be paid for accordingly; praying, further, a decree that the defendants were not entitled to claim or have any benefit from the contract, or to enforce any of its provisions until payment should be made of the amount due the complainant for ore delivered, and that they were especially not entitled to take possession of the mine under the agreement until they had paid to the complainant all that was due him, nor then, if on such payment the complainant should proceed without delay to mine and deliver ore, according to the contract. The bill further prays that an account may be

taken of the amount due for ore delivered, and the defendants be decreed to pay such amount, and that if such payment be not made, the contract be declared void as to any future action by the complainant, and that an injunction issue restraining the defendants from taking possession of the mine and its appliances.

The defendants duly answered the bill, and in July, 1882, filed a cross-bill, praying that the specific performance of the contract might be decreed, setting out their views of its meaning, alleging that there was nothing due to the complainant for ore delivered, but, on the contrary, that he had been overpaid, averring that they had sustained great loss by reason of his failure to make the stipulated deliveries of ore, and praying that their damages so caused might be assessed and awarded to them by decree, and insisting that they were entitled to possession of the mine and its appliances because of the complainant's defaults, and asking that he might be enjoined from retaining possession of the mine and from interfering with their possession.

On October 21st, 1882, the complainant answered this cross-bill, and, after proofs were put in, a final decree was made, against which both parties have taken these appeals.

One important subject of litigation is the right to the possession of the mine.

The contract provides that if complainant shall fail for thirty days to deliver the monthly quantity of ore as agreed upon (not less than 990 tons nor more than 1,010 tons per month), then defendants may, at their option, after thirty days' notice to complainant, take possession of the mine &c.

It is undisputed that complainant did not make the stipulated monthly deliveries; that after June, 1881, during which full deliveries were waived by mutual consent, and only about 238 tons were shipped, the deliveries were as follows :

July, 1881, about 750 tons, making, with June shipments, 988.20 tons; August, 548.10; September, 262.65; October, 624.10; November, 955.55; December, 430.85; January (1882), 1,076.30; February, 805.25; March, 644.85; April, 1,096.35.

On May 1st, 1882, complainant wrote defendants that he had instructed his superintendent at the mine not to ship any more

ore after that date, and none was thereafter sent before the filing of his bill. On May 11th, 1882, defendants gave complainant notice that after thirty days they would take possession of the mine because of his defaults under the contract, and also notified him of their purpose to continue the contract, under their option, until March 6th, 1907, the expiration of his lease.

It thus appears that on June 11th, 1882, the circumstances which, according to the terms of the bargain, should entitle defendants to possession of the mine, had occurred, viz., complainant had failed for thirty days to deliver the specified amount of ore, and the thirty days' notice had been given him. But he insists that he was justified in his failures and final refusal to deliver by the defaults of defendants. This brings us to a consideration of the defaults charged against defendants.

The first is their refusal to sample and assay the ore before its removal from Franklin.

In this we think they did only what they had a right to do under the contract. According to its terms, assays were to be made by them in the first instance, and no exact time or place is designated therefor. This would allow to them a reasonable discretion as to when and where the process should be conducted. In the absence of any express indication to the contrary, it is a fair presumption that assays were not to be made by them until they got possession of the ore, and as they were to receive possession by delivery on board the railroad cars at Franklin, the inference becomes probable that they were not to assay until the cars were unloaded at their place of destination—the defendants' works in Bethlehem. This inference is rendered almost necessary when we note the fact that in the process of sampling and assaying considerable machinery is needed, such as defendants already had at their works, and they could hardly be expected to incur the expense of providing similar machinery at the mine. The conduct of the parties immediately after entering upon the execution of the contract also shows that they had in contemplation assaying at Bethlehem rather than at Franklin, for on June 24th, 1881, soon after the arrival at Bethlehem of the first shipments of ore, the defendants' manager wrote to complainant:

"I have, received to date nine cars ore. I will run through the Blake crusher one cart-load from each car, and will run through the fine crusher one wheelbarrow of each cart-load run through the Blake. From this I will take a number of handfuls over the pile, and from these, when thoroughly mixed together, take sample for analysis. This I suggest as a fair method of arriving at the value of the ore. Shall be pleased to have any suggestions you may have to offer on the subject."

To which complainant replied:

. "Your method of sampling for assay is as good as can be devised, and fair for both. I would only suggest that you wait until you receive this week's shipments, about 200 tons, and then take your samples."

Complainant insists that assaying was required at Franklin, because defendants being bound to take the ore only in case it contained 26 per cent. zinc oxide, they must determine their option before taking it; that is, he contends, before its delivery on the cars. We think, however, that receipt on the cars was not the taking intended by the agreement, but that by such taking was meant the final acceptance of the ore, and that after receipt defendants were entitled to a reasonable opportunity to ascertain whether the ore contained 26 per cent. zinc oxide, and if it did not, to decide whether they would retain it. This distinction between receipt and acceptance is perfectly well settled in the cases (*Benj. on Sales* §§ *139, 140*), and we deem the right to accept or reject after receipt, if, on testing, the ore proved deficient in zinc, clearly given to the defendants by the contract. In this respect, therefore, they were not in default.

Complainant's next contention is that defendants failed to make due payments. This involves the account between the parties.

On complainant's side must be ascertained the quantity of ore delivered, the percentage of zinc oxide which it contained, and the prices to be charged for it.

The quantity is not in dispute.

With regard to the percentage of zinc oxide the parties widely differ. Defendants took samples in the manner indicated above by the letter of June 24th, 1881, and had analyses made by a chemist. Complainant independently had samples taken and

assays made, but there was no attempt by either party to secure concord between their separate tests, or to have a third conclusive assay made in accordance with the provisions of the contract. The vice-chancellor decided that the defendants' method of sampling was just; that in the absence of any effort to procure the final assay sanctioned by the agreement, their assays would be accepted, unless impeached for fraud or mistake; that there was no sign of fraud, but that in some cases mistake was shown by analyses made under his own direction. We find no reason to disturb these conclusions.

On the subject of price, also, the parties are at variance. Complainant insists that all ores accepted are to be valued as containing at least 26 per cent. of zinc oxide, and therefore worth, at least, $3.75 per ton. Defendants claim that the price of all ores containing less than 26 per cent. of zinc oxide is fixed by the contract (no other agreement being shown) at the market value of the ores as mangan iron ore, that is, $1.67 per ton. The vice-chancellor decided that all ores should be estimated according to the ascertained percentage of zinc oxide contained in them, and that the sliding scale of valuation fixed in the contract for ore containing more than 26 per cent. of zinc oxide should be applied also to ore containing less than that proportion until, in the descent, the market value of the ore as mangan iron ore was reached, which value should form a minimum price. The meaning of the contract touching the price of ore having less than 26 per cent. of zinc oxide, is obscure. After declaring that the price of ore containing 26 per cent. of zinc oxide shall be $3.75 per ton, and that the price of richer ore shall be increased in the proportion of fifty cents per ton for every additional 1 per cent. of zinc oxide, it provides that inferior ore may be taken "at such rate as may be agreed upon between the parties, such price not to exceed $3.75 per ton, or the market value of said ore as mangan iron ore." In our opinion, this contemplates two methods for fixing the price of inferior ore; one, by agreement of the parties, which, of course, is unlimited in its scope; the other, for want of such agreement, by judicial determination, which must not exceed $3.75 per ton, or the market value of

the ore as mangan iron ore. It is the second method that we are called upon to apply. The contract defines two limits to our judgment, $3.75 per ton, and the value of the ore as mangan iron ore ; but we do not think that the parties intended to have both of these limits applied to each case. It seems that ore containing less than 26 per cent. of zinc oxide may yet be useful as zinc ore, but that, if the deficiency be great, it becomes useful only as a mangan iron ore ; and our opinion of the meaning of the contract is that when the ore is rich enough in zinc oxide to be used for the manufacture of zinc, it is to be valued as a zinc ore, not absolutely, but with reference to the contract price of $3.75 per ton for ore having 26 per cent. of zinc oxide, but when not rich enough for the making of zinc it is to be valued as mangan iron ore. This construction secures a fair price under the stipulated rule for all inferior ore accepted, and avoids, on the one hand, the palpable injustice, for which complainant contends, of compelling defendants to pay for such ore as if richer than it is, and, on the other hand, the equally plain injustice, for which defendants contend, of allowing them to take ore containing ever so little less than 26 per cent. of zinc oxide at a price very much less than its value. According to the evidence, all the ore received was used as zinc ore ; but, aside from the contract, the testimony affords us no satisfactory means of determining the value of ores poorer than the standard. We, therefore, have no better method of estimating these inferior ores than the sliding scale which the contract provides for rich ores, and hence we concur with the vice-chancellor in adopting that method.

On the basis thus laid down, the amounts due complainant (including small sums for stone not embraced in the contract) are as follows :

| 1881. | | | |
|---|---|---|---|
| " | Aug. 15th.................. ......... ......... ......... | $1,776 | 28 |
| " | Sept. 15th.. ...... ......... ...... ...... ...... ...... | 2,160 | 87 |
| " | Oct. 15th....... ...... ......... .............. ......... | 2,065 | 77 |
| " | Nov. 15th.. ...... ............ ...... ......... ...... | 2,917 | 67 |
| " | Dec. 15th......... ......... ......... ................ | 4,224 | 24 |

Trotter *v.* Heckscher.

| 1882. | Jan. 15th.......... ...... ......... ......... ......... | $913 40 |
| " | Feb. 15th...... ......... ......... ......... ......... | 2,566 98 |
| " | March 15th...... ...... ......... ...... ......... | 4,094 70 |
| " | April 15th...... ...... ......... ...... ...... ...... | 3,053 36 |
| " | May 15th......... ......... ...... ......... ......... | 2,017 28 |

$25,790 55

Against this the undisputed credits are as follows:

| 1881. | June 4th, cash...... ......... ...... ...... ...... | $6,000 00 |
| " | Oct. 17th, " ...... ......... ...... ......... ...... | 3,000 00 |
| 1882. | Jan. 14th, " ......... ......... ......... ......... | 5,000 00 |
| " | April 19th, " ......... ......... ......... ......... | 5,000 00 |
| " | " 30th, expense of hauling ores for complainant December, 1881, to date ......... ......... ...... ...... | 889 08 |

$19,889 08

It thus appears that, with a fair allowance of interest on advances made to complainant, all the moneys growing due up to and including November 15th, 1881, were paid by defendants in advance; that the moneys growing due on December 15th, 1881, and January 15th, 1882, were paid by them on January 14th, 1882; that the moneys growing due February 15th, 1882, and a large part of those accruing March 15th, 1882, were paid by them January 19th, 1882, and that, when the complainant gave notice that he would make no further deliveries of ore, part of the sum due March 15th, and the sum due April 15th, were in arrears, amounting to less than $5,000.

The default of defendants on and after May 1st, 1882, is therefore established, and the question then arises whether such default released complainant from his obligation to deliver ore, and from the consequences which he had agreed should follow on his failure to do so.

The rule applicable to cases of this stamp has been very recently settled in this court by the decision in *Blackburn* v.

*Reilly, 18 Vr. 290.* It was there held that ordinarily, in continuing contracts of sale, defaults by one party in making particular payments or deliveries will not release the other party from his duty to make the other deliveries or payments stipulated in the agreement, unless the conduct of the party in default be such as to evince an intention to abandon the contract, or a design no longer to be bound by its terms. The question, therefore, is whether the default of defendants shows a purpose to abandon the bargain or to disregard its provisions. On this point we have no hesitation. The default was brought about by two causes—one, the mistakes of defendants' chemist in analyzing franklinite ore ; the other, the indefiniteness of the contract with regard to the price of ore below the standard. It is undisputed that the analysis of franklinite is an exceptionally difficult process, and the chemist's erroneous results do not even suggest to us intentional wrong on the part of his employers. The contract purposely left the price of inferior ore unsettled, and complainant made no fair effort to effect an arrangement on that subject, although the need of such an arrangement sprang out of a breach of his own guaranty. So far as the price of ores was ascertained, the defendants had more than paid for them, as also they had, so far as they themselves acknowledged, indebtedness on account of the ores delivered ; and it is only because the mistakes of their analyst have been corrected and a construction has been put upon the contract differing from that for which they honestly contended, that they now appear to have owed more than they paid. Certainly this does not indicate any repudiation of the obligatory force of the agreement. Complainant therefore remained bound to make the stipulated deliveries of ore, or to abide the consequences which he had covenanted should ensue. ·

Our judgment, therefore, is, that on June 11th, 1882, defendants became entitled to possession of the mine, and the decree below to the contrary should be reversed.

This substantially disposes of the claims involved in the original bill. The additional matter introduced by the cross-bill is defendants' prayer to have their damages arising out of com-

Trotter *v.* Heckscher.

plainant's defaults assessed in equity.   Defendants contend that the court of chancery has jurisdiction of this matter because there exists an equitable right to have those damages set off against the price of ore delivered.

As a general principle, equity follows the law in the allowance of a set-off.   If, however, special circumstances be shown creating an equity to have cross-demands balanced against each other, courts of equity will transcend the rules of law for the protection of such a right.   *Robbins* v. *McKnight, 1 Hal. Ch. 642; Black* v. *Whitall, 1 Stock. 572; Dade* v. *Irwin, 2 How. (U. S.) 383; Dodd* v. *Lydall, 1 Hare 333.*

It is clear that defendants' damages could not be set off at law. Their being unliquidated prevents such a disposition of them under the common statutes of set-off, and the fact that they arose upon the breach of a contract under seal formed, when the decree below was rendered, an obstacle to recouping them under section 129 of the practice act.   *Rev. p. 868.*   Nor do they enter naturally into the proper computation of the amount to be allowed for the ore delivered; that ore was worth just as much as it would have been if complainant had fulfilled every iota of his bargain.   So that in no aspect could these damages have availed at law to defeat or lessen the recovery for ore delivered. Is there, then, any special circumstance which makes them available in equity?   The chief reliance of defendants is placed upon the fact that the damages were caused by a breach of the very contract on which complainant founds his suit.   The cases, however, hold that this circumstance does not warrant a court of equity in blending together demands otherwise distinct.   In *Duncan* v. *Lyon, 3 Johns. Ch. 351,* the complainant and defendant had entered into a sealed contract that the complainant should furnish certain timber to the defendant, which the defendant was to take to Canada and sell, dividing the proceeds with the complainant.   The defendant had sued the complainant at law for breach of the covenant to furnish the timber.   The complainant's bill sought an account of the proceeds of sale, and to restrain execution in the suit at law, so that the defendant's damages might be set off against whatever might be found due the com-

plainant on the account.     Chancellor Kent refused the injunction, holding that there was no equitable right of set-off.     In *Rawson* v. *Samuel, 1 Cr. & Ph. 161,* a precisely similar question was presented, and Lord Cottenham also refused an injunction, using this language : " We speak familiarly of equitable set-off as distinguished from the set-off at law, but it will be found that this equitable set-off exists in cases where the party seeking the benefit of it can show some equitable ground for being protected against his adversary's demand.     It was said that the subjects of the suit in this court and of the action at law arise out of the same contract, but the one is for an account of transactions under the contract and the other for damages for the breach of it.     The object and subject-matters are therefore totally distinct ; and the fact that the agreement was the origin of both does not form any bond of union for the purpose of supporting an injunction."     In *Best* v. *Hill, L. R. (8 C. P.) 10,* the plaintiffs sued for money advanced and commissions, and the defendant interposed, as a defence on equitable grounds, a plea that the parties had agreed that the defendant should consign rice to the plaintiffs, who were to make advances thereon, sell the rice, retain their advances and commissions out of the proceeds, and remit the balance to the defendant ; that the defendant had so consigned the rice on which the plaintiffs had made advances, but that the plaintiffs had been guilty of such negligence and misconduct in the care and sale of the rice that it had brought much less than it ought to have done, and so had not realized enough to repay the advances and commissions ; that the balance of these advances and commissions was the moneys mentioned in the declaration, and that but for the plaintiffs' negligence and misconduct the sales would have satisfied their claim.     On demurrer, the plea was held bad.     Disposing, for other reasons, of the suggestion that the plea was good as amounting to the general issue, Chief-Justice Bovill said : " With regard to the question whether the plea can be supported as an equitable plea, it appears to me to be clear that it cannot, on the ground that the claim is for unliquidated damages, the amount of which has not been ascertained.     Although these cross-claims in one sense are connected, inasmuch as they

arise out of the same contract, that does not appear to be sufficient, according to the doctrine of equity in relation to set-off; one claim arises out of the performance of the contract, the other out of its breach. This case seems to me, in principle, undistinguishable from *Rawson* v. *Samuel.*"

The same doctrine seems to be approved by the chancellor in *Hewitt* v. *Kuhl, 10 C. E. Gr. 24.*

These authorities, we think, dispose of this ground of set-off.

It is suggested in the brief of counsel that the set-off should be allowed because of the insolvency of complainant, or under the rule that when once equity acquires jurisdiction of a subject, the jurisdiction will be retained for the purpose of doing complete justice between the parties. As to insolvency, it is enough to say that this fact is nowhere made an issue in the pleadings; and with regard to the other suggestion, that justice is completely done in the cause whenever all the rights of both parties in the matters propounded by the bill of complaint or equitably connected therewith are settled and secured. That the rule invoked does not require the court to pass upon a distinct claim of the defendant not so connected merely because the parties are the same; nor does the maxim that he who asks equity must do equity help the defendants; for it does not mean that a complainant must do equity to the defendant in all transactions which have ever taken place between them, but only with respect to those on which he seeks equity, and such as are equitably related thereto. It still leaves to be determined the question whether there is, in the view of a court of equity, any bond between the grounds of complaint and the grounds of defence.

The vice-chancellor, therefore, was right in refusing to entertain defendants' claim for damages on breach of covenant.

Since the decree below, the aspect of the general question has been changed by the rule of the supreme court extending the statutory recoupment to contracts under seal, but that, of course, does not affect the merits of the present decree.

The decree below awards costs to complainant. As he succeeds on a substantial portion of his bill, that praying an account, and that the balance on accounting be paid to him, and as de-

fendants fail on their claim of set-off, which seems to have been the leading motive of their cross-bill, this award may stand. So, also, we see no inequity in the order that the expenses of the temporary manager be divided between the parties.

Defendants are entitled to the costs of the appeals.

Let the decree below be reversed, and a decree be entered in accordance with the foregoing views.

*Decree unanimously reversed.*